## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRACY CONNER,<br><br>                          Plaintiff,<br><br>          v.<br><br>UNIVERSITY OF MASSACHUSETTS-<br>AMHERST,<br>                       Defendant. | COMPLAINT AND DEMAND FOR JURY TRIAL<br><br>Civil Action No. ł18-cv-11693 |

## PARTIES, JURISDICTION AND VENUE

1.    The plaintiff, Tracy Conner ("Ms. Conner"), resides in Frisco, Texas. She is currently enrolled in the Department of Linguistics in the defendant University of Massachusetts at Amherst ("UMass-Amherst" or "the University"), as a graduate student pursuing her doctorate in linguistics.

1.    Ms. Conner is a female African-American and suffers from dyslexia, a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12102(1); *see also* 29 C.F.R. § 1630.2(g)(1).

2.    The defendant UMass-Amherst is a public educational institution, part of the higher education system of the Commonwealth of Massachusetts, with its principal campus in Amherst, Hampshire County. It receives federal financial assistance within the meaning of Title VI of the Civil Rights Act of 1964.

3.    Ms. Conner timely filed a complaint with the Massachusetts Commission Against Discrimination, Docket No. 17-SED-01109, alleging that UMass unlawfully discriminated against her on account of her gender, race, color and disability.  Ms. Conner, by her counsel, withdrew her complaint on or about October 27, 2017, so as to bring the instant action.

4.   This is a civil rights action arising under 42 U.S.C. § 1983.  Jurisdiction over the federal civil rights claim is pursuant to 28 U.S.C. § 1331.  Jurisdiction over other state law claims connected with the same transaction is pursuant to 28 U.S.C. § 1367.

5.   Although a state actor for the purpose of the Fifth and Fourteenth Amendments to the Constitution of the United States and the federal statutes enacted for the enforcement of the rights recognized therein, UMass-Amherst is not an "arm of the state" immune to suit under the Eleventh Amendment.

## FACTS COMMON TO ALL COUNTS

6.   Ms. Conner graduated from Stanford University with a bachelor's degree in Linguistics in 2006 and a Masters in Sociology in 2007. She completed her Masters in Communication Disorders from UMass-Amherst in 2010, earning her certification as a licensed speech therapist. Ms. Conner worked as a speech therapist before until enrolling as a graduate student at UMass Amherst.

7.    Ms. Conner was accepted as a doctoral candidate in the Linguistics Department of UMass-Amherst (the "Department") in 2010.  The University anticipated that the program would take five to six years to complete, and Ms. Conner received funding for that period in the form of teaching and research stipends. In 2011, Ms. Conner was awarded a UMass Diversity Fellowship after being nominated by Prof. Joe Pater, now Chair of the Department. The fellowship provided a year of funding with no teaching responsibilities.

8.   During the 2013-2014 school year, Ms. Conner was awarded sixth-year funding to support a further year of study of experimental methods and statistics to acquire additional skills in the design of research projects and the validation and interpretation of research data.

9.    During the academic year 2015-16, Ms. Conner successfully completed all of the Department's requirements for a doctorate in linguistics, completing two "Generals Papers," each a one-year project, and completing all coursework.  The Generals Papers were intended to, and did, establish the framework for Ms. Conner's research program further developed in her dissertation.

10.   On the strength of Ms. Conner's published 2014 article and her academic record in general, and in anticipation of the successful defense of her dissertation, the University of Kentucky offered Ms. Conner a two-year post-doctoral fellowship to begin on September 1, 2016, with the promise of a tenure track position thereafter.

11.   The department's approval of her two Generals Papers meant that Ms. Conner had "demonstrate[d] an ability to discover an interesting topic of appropriate size, knowledge of the appropriate literature and the ability to work within a theoretical framework, clear exposition, and originality," DOCTORAL STUDENT HANDBOOK OF POLICIES AND REGULATIONS (June 2, 2016.)

12.   Ms. Conner thus became eligible for the formation of a Doctoral Dissertation Committee to oversee her doctoral thesis.  The Committee was appointed in the fall of 2014. The Chairs of the Committee were Dr. Kyle Johnson and Dr. Lisa Green. The other members from the Linguistics Department were Profs. Tom Roeper and Jeremy Hartman. In accordance with the regular practice a member from outside the department was appointed—Dr. Jill Hoover from the Department of Communication Disorders.

13.   On December 22, 2015 Ms. Conner submitted, and the Committee subsequently approved, a dissertation prospectus describing the research she planned to conduct, analyze and present. The proposed subject was "ellipsis licensing" and the manner in which usage in African-

American English ("AAE"), as determined through research in the field, might inform current linguistics theory concerning ellipsis.

14.  In fact, Ms. Conner had completed most of her work on the dissertation at the time the prospectus was filed. Ms. Conner had conducted extensive field research with informants in Mississippi and elsewhere. Her preliminary analysis of the results was published in an article that appeared in December, 2014 entitled "Heads Must Be Heard: Overtness and Ellipsis Licensing," in the academic volume PARENTHESIS AND ELLIPSIS: CROSS-LINGUISTIC AND THEORETICAL PERSPECTIVES.  The article contained material very similar to the introduction, experimental data and analysis sections of Ms. Conner's dissertation in progress. Professors Johnson and Green, later members of Ms. Conner's Dissertation Committee, reviewed and commented upon the content of the article before its publication.

15.  On or about May 27, 2016, the Dissertation Committee fixed the date for Ms. Conner's oral defense of her thesis as August 3, 2016. According to the University, "[w]hen, in the judgment of the committee, the student has a draft that is sufficiently complete to be able to defend, a defense is scheduled," UMass-Amherst MCAD Position Statement at 2. Thus fixing the date of the defense was an acknowledgement that the draft was "sufficiently complete to be able to defend."

16.  As the Committee members were already substantially familiar with the contents of the thesis from Ms. Conner's previously published article, they indicated that the defense would focus on the updated analysis section only. By July 9, 2016, Ms. Conner had submitted such chapter of her thesis to Prof. Johnson and Prof. Green.

17.  However, Lisa Green and Kyle Johnson told Ms. Conner at a meeting on July 15, 2016 that she would not be permitted to defend her dissertation on August 3, the date originally fixed,

because they had not seen the text of the entire dissertation.  They encouraged her to postpone the defense so she would have more time to revise before leaving for her new position at the University of Kentucky, see *infra* ¶ 46.  The defense date was supposedly moved to August 25, 2016.

18.   Ms. Conner submitted the entire text of the dissertation with the requested revisions on July 19, 2016. On that day she met again with Drs. Johnson and Green. For the first time they raised concerns about the contests of the dissertation. Prof. Johnson in particular stated that the analysis did not appear to be consistent with the discussions he "remembered" from the previous year, although it was essentially the same as the analysis approved and published in December, 2014. Professors Johnson and Green reiterated these concerns at a July 22 meeting.

19.   By July 25, 2016 it appeared that Ms. Conner had satisfactorily addressed the Committee's concerns. In a meeting of the Committee on that date, all members stated that the analysis was appropriate for defense and Dr. Johnson stated that he did not need to see another draft.

20.   But by August 8, Prof. Johnson was objecting to the use of specific ellipsis data from African-American English ("AAE") rather than "standard" English to substantiate the analysis. The point of Ms. Conner's research was to show that AAE data had not been evaluated in the ellipsis literature to date, and data from this variety of English provided the necessary linguistics environments to understand a fundamental ingredient for ellipsis licensing that had not yet been accessible in other languages.

21.   As the editing process continued through early August, Ms. Conner received inconsistent feedback and directives from both Dr. Johnson and Dr. Green. Dr. Johnson also

demanded that Ms. Conner "augment" the analysis in ways that would affect its viability. Prof. Johnson refused at all times to put his concerns and recommendations in writing.

~~22.~~  On or before August 15, 2016, Prof. Green apparently canceled the defense with the graduate school, informing Graduate Dean McCarthy via email, without telling Ms. Conner, that the defense had been indefinitely postponed. Dr. Johnson and Prof. Green reached this decision without informing, much less consulting, Prof. Hoover, the "external" member of the dissertation committee.

~~23.~~  On that day, Ms. Conner met with Dean McCarthy, to express her concerns.  To her surprise, the Dean offered to help Ms. Conner to find funding "for the next several months," implying that the defense might not take place during that period.

24.  On the same date, Prof. Green took it on herself to inform the University of Kentucky that Ms. Conner would be unable to start her new job on time because her defense had been indefinitely postponed and began without authority to "negotiate" for a new start date with the University of Kentucky. She did so without Ms. Conner's written permission, in violation of the Family Educational Rights and Privacy Act of 1974 ("FERPA"), 22 U.S.C. § 1232g, which prohibits the release of confidential information concerning a student's educational records. Her intercession was also a wrongful interference with Ms. Conner's advantageous contractual relationship with the University of Kentucky.

25.  Ms. Conner was not explicitly informed that her defense had been canceled until August 21, 2016, when she learned it from Prof. Tom Roeper. Prof. Green confirmed the cancellation the next day.

26.  After the defense was canceled, Dr. Johnson continued to refuse further written feedback, stating in an e-mail on August 16, 2016 that "It takes a lot of time.". Dr. Johnson

further reiterated his refusal when the Disability Office inquired whether they would be willing to do so as an "accommodation."

27.   Despite much effort and many meetings, Ms. Conner was unable to get her several thesis drafts accepted or her defense scheduled by October 27, 2016, when Prof. Kyle was "removed" from the dissertation committee for reasons unknown. Prof. Roeper eventually informed Ms. Conner that Prof. Johnson had resigned because of his fears that Ms. Conner would sue him for unlawful discrimination.  In fact, Ms. Conner never intended or threatened to do so, and has not included him in the instant action.

28.   As a practical matter, Prof. Johnson's removal or resignation made a defense impossible, because he was the only committee member with specific expertise in ellipsis, the topic of Ms. Conner's research. Ms. Conner made efforts to add Prof. Klaus Abels of the University College of London, another ellipsis expert, to the Committee in his stead, but her efforts were rebuffed by Lyn Frasier, the acting graduate program director.

29.   On July 24, 2017, Prof. Green also resigned from the Committee.  On information and belief, this was the same day she received a copy of Ms. Conner's MCAD Complaint, *see* ¶ 3, *supra*.

30.   On the following day, Prof. Roeper told Ms. Conner by e-mail that he would no longer serve on the Committee if Prof. Green left. He went on to say that Prof. Green was "very much upset" by the MCAD Complaint, suggesting that Ms. Conner had caused "acrimony" in the Department and resolving it was her responsibility.

31.   The next day, July 26, Prof. Roeper e-mailed Ms. Conner to suggest that she read a very polemical book about the unfairness of Title IX complaints by students and their terrible consequences for those accused.  "The book (90 pages of it) is a defense of Peter Ludlow . . .

who lost his job at Northwestern and went broke because [of] really accusations by an undergraduate—now lives in some poverty in Mexico.   I know that both Lisa and Kyle are afraid of the consequences of your legal moves. . . I think you should withdraw your complaints and carefully apologize to both of them.  That would be the best course for you and for everyone."

32.   In December 2017 Ms. Conner was negotiating with the assistance of counsel for her reinstatement in the graduate program and the reconstitution of her Dissertation Committee.  On December 8, 2017 Prof. Roeper emailed her to say:  "I am not sure it is possible for members of our dept to be involved in a dissertation when a lawsuit exists in which they might be deposed on issues related to its content.  That is both a personal and a legal question." (In fact, Ms. Conner had never brought a "lawsuit" against the Department and the MCAD Complaint had already been withdrawn.)

> ## Pattern of Disparate Outcomes for Female Ph.D. Candidates in the Linguistics Department.

33.   There is strong evidence of unlawful discrimination by the UMass-Amherst Linguistic Department against female Ph.D candidates over many years.  For those students who began their studies between 2006 and 2012, 81 percent of male candidates (17 of 21) had successfully completed their degrees as of 2018. During the same years, only 47 percent (8 of 17) female candidates received their doctorates. These numbers do not include three students who left the program during their first year, two of whom were women. Ms. Conner was the only African-American woman accepted to the program during these years.  Although there are international students from diverse countries, every American enrolled in the program from 2012-2016 was white.

34.   More specifically, Professor Johnson refused to permit another female graduate student to defend her dissertation after two years of additional work on her thesis under his supervision.  Another female student was forced to leave the program because two professors specializing in semantics refused to oversee her second Generals paper, although she was in good standing in every respect.

35.   These statistics were assembled by a group of 27 graduate students in linguistics. They presented their findings to the Department by an anonymous letter on April 11, 2016. On information and belief, no investigation has occurred, and no response has been published, although the office of the Ombudsman conducted an informal fact-finding.

36.   The Department did set up a committee to consider issues of bias and discrimination, and Ms. Conner volunteered to serve.  Ms. Conner was the only black representative. She, alone among the representatives, was the only graduate student asked to affirm in writing that none of the facts and information disclosed during the investigation could be used in litigation (although others were orally so informed.)

Ms. Conner's Disability Diagnosis (Dyslexia)

37.   In the spring of 2014, Ms. Conner became concerned that although able to do her coursework, she was expending more effort than her colleagues in the program and taking more time to do so. Suspecting that she might suffer from Attention Deficit/Hyperactivity Disorder ("ADHD") and/or a previously undiagnosed learning disability, she approached the Center for Counseling and Psychological Health at UMass-Amherst for psychological assessment and evaluation. Ms. Conner confided her concerns to Dr. Green and stated that she had sought testing.

38.   The Center informed Ms. Conner that formal testing revealed some evidence of delays in cognitive processing speed consistent with ADHD, but any academic difficulties she was

experiencing were personal to her and her situation, implying that she was essentially incapable of performing the necessary academic work at the level required.

39.   Dissatisfied with this response, Ms. Conner was referred for a second opinion by UMass Clinical Head Melissa L. Rotkiewicz.  She found a clinical psychologist in private practice, Laurie Ostendorf, Psy.D., for an objective external evaluation, which took place on February 26, 2014. She determined on the basis of standard test instruments that Ms. Conner suffered from both ADHD and dyslexia. With respect to the latter, Ms. Conner scored no better than average on standardized tests, whereas a doctoral candidate with her level of education would be expected to score far higher.

40.   Specifically, Dr. Ostendorf found that Ms. Conner had relative weaknesses in working memory and executive function.  The elements of dyslexia present included weaknesses in phonological processing, reading fluency and comprehension, and math fluency.

41.   Dr. Ostendorf also found that Ms. Conner had in the course of her education developed extensive coping strategies. As Ms. Conner had suspected, the implementation of these strategies required substantial extra effort directed toward memorization and extensive rewriting.

42.   Apart from medication to ameliorate symptoms of ADHD, Dr. Ostendorf recommended a number of assistive modalities ostensibly available through the Disability Services Office at UMass Amherst, including audio texts, text-to-speech software and reading pens to assist with reading; and voice recognition software to help with writing.

43.   Ms. Conner accordingly requested certain accommodations from the UMass-Amherst Disability Services Office and was assigned a Consumer Manager. On June 26, 2014, the manager informed Prof. Lisa Green, later a member of Ms. Conner's Dissertation Committee, and Dr. Frasier and Dr. Yu, who formed the committee overseeing Ms. Conner's second Generals

paper, that Ms. Conner required certain accommodations. In a private meeting, Dr. Frasier

demanded that Ms. Conner explain her specific disability, and insisted that the information be

generally shared in a department faculty meeting. Ms. Conner also discussed her diagnosis

personally with Drs. Green and Johnson.

44.   The knowledge of Ms. Conner's disability apparently gave rise to a fixed

determination in the minds of the Committee members that she was incapable of assimilating

written information.  This conclusion became the justification or excuse for refusing to provide

Ms. Conner with written feedback on her dissertation drafts of the sort that is routinely provided

to other Ph.D. candidates.

45.   On or around August 19, 2016, after Drs Green and Johnson had threatened to cancel

Ms. Conner's defense altogether, Ms. Conner requested disability accommodations and advocacy

from Ben Ostiguy, the new Associate Director of Disability Services at UMass-Amherst. Mr.

Ostiguy drafted a list of proposed accommodations in that meeting, but he never sent them to the

Department,  nor did he reply to Ms. Conner's follow-up request on September 2nd, 2016 via

email.

46.  On September 15, 2016, almost a month later, Mr. Ostiguy revealed to Ms. Conner in

a telephone call that he had never made a formal request for these accommodations, either orally

or in writing.  He eventually explained that Prof. Kyle Johnson, the chair of Ms. Conner's

dissertation committee, had rejected the accommodations in a telephone call as "not necessary."

47.   The failure to accommodate Ms. Conner violated Title II of the Americans with

Disabilities Act.  UMass/Amherst is subject to Title II, 42 U.S.C. § 12131(1)(B) ("any

department, agency, special purpose district, or other instrumentality of a State or States or local

government.")

48.  Ms. Conner filed an informal grievance with the University Equal Opportunity Office (the "EOO") against Mr. Ostiguy on November 23, 2016 for his failure to pursue her request for reasonable and timely accommodations. On information and belief, no investigation was ever conducted. Ms. Conner was never interviewed or even contacted by the EOO until February 28, 2017, when she was told that the investigation was still "ongoing." On June 9, 2017, she was notified that the investigation had been concluded.  However, no findings were provided and no action was identified or taken.

49.  Ms. Conner also included a further informal grievance to the EOO concerning Prof. Green and Johnson's apparent intercession to deny her written feedback with respect to the text of her dissertation. She was informed that an investigation was conducted and received a report stating that EOD did not find evidence of discrimination.

50.  The failure of the EOO to investigate and resolve Ms. Conner's grievances violated the written UNIVERSITY GRIEVANCE POLICY AND PROCEDURES (the "Grievance Policy") as follows:

(a)  The EEO did not solicit supporting data and documents from Ms. Conner, in violation of Grievance Policy II.B.1. (e);

(b)  The EOO failed to conduct an investigation and to prepare written findings of fact regarding disability services, Grievance Policy II.B.2. (a), (b);

(c)  The EOO failed to prepare a written report of its investigation regarding disability services, make recommendations, and serve its findings on "the appropriate vice chancellor or executive officer," Grievance Policy II.B.3; and

(d)  The EOO failed to notify Ms. Conner of the position of the University concerning its findings regarding disability services.

51.  In summary, it appears that after six years of work, study, research and writing, in which Ms. Conner fully demonstrated her academic and intellectual capacity to satisfy the requirements for a Ph.D. in linguistics, and in fact satisfied them, the Dissertation Committee,

and Dr. Johnson in particular, formed a fixed intention not to award her the degree by refusing to allow her to defend her dissertation for reasons that were never explained, based on criticisms and criteria which they refused to set down in writing, and which Ms. Conner was never given the opportunity to address or satisfy. They did so as the result of a prohibited discriminatory animus against her as an African-American woman, as shown by their hostility to her research into AAE; their interference with her job prospects;  and the provable pattern of discrimination against female candidates in the department, see ¶¶ 30-33.

52.  Drs Johnson and Green also did so as the result of a prohibited discriminatory animus against her on account of her disabilities, as shown by their refusal to entertain the accommodations proposed by the Disability Office and their insistence on informing all faculty members in the department of Ms. Conner's diagnosis to her prejudice.

## DAMAGES

53.  The two-year postdoctoral fellowship awarded to Ms. Conner by the University of Kentucky included an annual salary of $35,000, commensurate benefits, and a $5,000 research allowance.

54.  The salary for Ms. Conner's tenure-track position would have been no less than $70,000 and would have continued, with at least cost-of-living increases, until the decision to grant or deny tenure after seven years.

55.  Ms. Conner moved to Kentucky to take up her fellowship in August, 2016, renting living accommodations on a year's lease.

56.  The University of Kentucky withdrew its offer in November, 2016, when it became apparent that Ms. Conner would be unable to defend her dissertation for the reasons described above.

57.    After Ms. Conner brought her complaint against UMass Amherst at the MCAD, and

with the assistance of legal counsel, she was able to establish a new dissertation committee.  She

now expects to defend the dissertation not later than 2019.

58.   As a consequence of the discriminatory actions of UMass-Amherst, including its

failure to accommodate her disabilities, Ms. Conner has suffered significant damages, *viz.*:

(a)   The loss of the two-year postdoctoral stipend associated with her fellowship at the
University of Kentucky--$70,000 plus the value of associated benefits such as
medical insurance. The cost to Ms. Conner of supplying her own health insurance
over this two-year period has equaled approximately $4,200 per year.

(b)   Ms. Conner will be damaged in the amount of approximately $70,000 per year for
each year that the beginning of her academic career as a tenure-track professor is
postponed, based on an estimate of $70,000 per year for her salary as an assistant
professor at the University of Kentucky, beginning in September, 2018.

(c)   When the Committee declined to hear Ms. Conner's defense of her dissertation,
she had already actually moved to Kentucky to take up the fellowship.  When the
fellowship was withdrawn, Ms. Conner was compelled to move back to her family
home in Texas. Ms. Conner lost over two-thirds of the rent she had agreed to pay
under her Kentucky lease--$10,800.  She also incurred a total of $9,000 in moving
costs, first from Massachusetts to Kentucky ($5,000), then from Kentucky to
Texas ($4,000). Since August 2017, Ms. Conner has paid $200/mo. in storage
costs--$1600 to date.

(d)   Emotional distress in an amount not less than $75,000, including the costs of
psychotherapy necessary to mitigate such distress.

## COUNT I
### Deprivation of Rights under Color of Law
### in Violation of 42 U.S.C. § 1983

59.    The allegations of ¶ 1 – 58 of this Complaint are hereby realleged and incorporated

into this Count I by reference.

60.    The plaintiff Tracy Conner has a property interest in continuing her graduate studies

in linguistics at UMass Amherst, and may not be deprived of the same by a state actor without

due process of law.

61.   By denying the plaintiff Tracy Conner a reasonable opportunity to complete and defend her dissertation and a fair evaluation of her academic achievement, the defendant UMass-Amherst deprived Ms. Conner of rights and privileges secured to her by the Fifth and Fourteenth Amendments to the Constitution of the United States, in violation of 42 U.S.C. § 1983, to her harm.

## COUNT II
### Breach of the Americans with Disabilities Act

62.   The allegations of ¶¶ 1 – 58 of this Complaint are hereby realleged and incorporated into this Count II by reference.

63.   By denying the plaintiff Tracy Conner the reasonable accommodation to which she was entitled and which she required for the successful completion of her dissertation and a fair evaluation of her academic achievement the University violated her rights under the Americans with Disabilities Act, 42 U.S.C. § 12101, to her great harm and damage.

## COUNT III
### Prohibited Racial Discrimination

64.   The allegations of ¶¶ 1 – 58 of this Complaint are hereby realleged and incorporated into this Count III by reference.

65.   In denying the plaintiff Tracy Conner a reasonable opportunity to complete and defend her dissertation and a fair evaluation of her academic achievement, the defendant UMass-Amherst was motivated by a prohibited discriminatory animus based on Ms. Conner's race and color, and thereby violated her rights under Title VI of the Civil Rights Act of 1964, , 42 U.S.C. § 2000d, to her great harm and damage.

## COUNT IV
### Prohibited Gender Discrimination

66.  The allegations of ¶¶ 1 – 58 of this Complaint are hereby realleged and incorporated into this Count IV by reference.

67.  In denying the plaintiff Tracy Conner a reasonable opportunity to complete and defend her dissertation and a fair evaluation of her academic achievement, the defendant UMass-Amherst was motivated by a prohibited discriminatory animus based on Ms. Conner's sex, and thereby violated her rights under Title IX of the Civil Rights Act of 1964 as amended, 20 U.S.C. § 1681, to her great harm and damage.

## COUNT V
### Prohibited Retaliation

68.  The allegations of ¶¶ 1 – 58 of this Complaint are hereby realleged and incorporated into this Count V by reference.

69.  The members of Ms. Conner's Dissertation Committee, by withdrawing from the same because she had brought an MCAD Complaint; by threatening that no member of the Department would serve for fear of such complaints; and by demanding that she withdraw her complaint and "carefully apologize" personally to the committee members, unlawfully retaliated against her for her exercise of her protected right to complain of unlawful discriminatory actions against her.

## COUNT VI
### Breach of Contract

70.  The allegations of ¶¶ 1 – 58 of this Complaint are hereby realleged and incorporated into this Count VI by reference.

71.   At all times relevant to this action the plaintiff Tracy Conner and the defendant UMass-Amherst were mutually bound by an executory contract under which the University was obligated to provide Ms. Conner with an opportunity to earn her degree based upon a fair and objective evaluation of her academic performance and professional fitness, free of discrimination.

72.   UMass-Amherst was further bound by its own policies and procedures prohibiting discrimination on account of race, disability and gender, and providing for the prompt and fair investigation and resolution of grievances concerning such discrimination.

73.   By refusing to permit Ms. Conner to defend her dissertation in the ordinary course on the basis of supposed deficiencies in her submission unsupported by evidence and without the opportunity to identify and correct such deficiencies, as the result of a discriminatory animus against Ms. Conner based on her race, color and disability, and by denying her the due process rights specifically guaranteed to her by its own codes, policies and regulations, which were incorporated into and formed part of the contract between the parties, the University materially breached such contract, to Ms. Conner's great harm and damage.

## COUNT VII

### Breach of Covenant of Good Faith and Fair Dealing

74.   The allegations of ¶¶ 1 – 58 of this Complaint are hereby realleged and incorporated into this Count V by reference.

75.   At all times relevant to this action the plaintiff Tracy Conner and the defendant University of Massachusetts Amherst were mutually bound by an executory contract which included an implied covenant of good faith and fair dealing under which the University was

obligated to provide Ms. Conner with an opportunity to earn her degree based upon a fair and objective evaluation of her academic performance and professional fitness.

76.    By refusing to permit Ms. Conner to defend her dissertation in the ordinary course on the basis of supposed deficiencies in her submission unsupported by evidence and without the opportunity to identify and correct such deficiencies, as the result of a prohibited discriminatory animus against Ms. Conner based on her race, color, gender and disability, and by denying her the due process rights specifically guaranteed to her by its own codes, policies and regulations, which were incorporated into and formed part of the contract between the parties, the University breached its covenant of good faith and fair dealing, to Ms. Conner's great harm and damage.

**WHEREFORE** the plaintiff Tracy Conner demands judgment in an amount not less than $600,000 against the defendant University of Massachusetts at Amherst, plus costs, reasonable attorney's fees, and statutory interest; and prays for such other and further relief to which she may be entitled.

Respectfully submitted,

**TRACY CONNER**, Plaintiff
By her attorney,


_____/s/ David J. Fried_____
David J. Fried, BBO #179640
**DAVID J. FRIED & ASSOCIATES**
10 Tower Office Park, Suite 521
Woburn, MA 01801
(339) 999-2984
dfried@fried-law.com

August 10, 2018